RECORD NO. 15-2207

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**HERBERT E. LIVERMAN and VANCE R. RICHARDS,**

*Plaintiffs-Appellants,*

**v.**

**CITY OF PETERSBURG**
**and**
**JOHN I. DIXON, III, both individually and in his capacity as**
**the Chief of Police for the City of Petersburg Bureau of Police,**

*Defendants-Appellees.*

_____

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND**

Andrew Thomas Bodoh
THOMAS H. ROBERTS
 & ASSOCIATES, PC
Suite A
105 South 1st Street
Richmond, Virginia 23219-0000
(804) 783-2000 (Telephone)
andrew.bodoh@robertslaw.org

Counsel for Plaintiffs-Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is not required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 15-2207 _____    Caption: Liverman et al. v. City of Petersburg et al. _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Herbert E Liverman _____
(name of party/amicus)

_____

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                          ☐ YES ☑ NO
      If yes, identify all such owners:

i

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Andrew T. Bodoh _____    Date: _____ 10/9/2015 _____

Counsel for: Herbert E. Liverman _____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is not required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 15-2207 \_\_\_\_\_      Caption: Liverman et al. v. City of Petersburg et al. \_\_\_\_\_

Pursuant to FRAP 26.1 and Local Rule 26.1,

Vance R. Richards \_\_\_\_\_
(name of party/amicus)

\_\_\_\_\_

who is \_\_\_\_\_ appellant \_\_\_\_\_, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                         ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Andrew T. Bodoh_____    Date: _____10/9/2015_____

Counsel for: Vance R. Richards_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vii

JURISDICTIONAL STATEMENT ......................................................1

REQUEST FOR ORAL ARGUMENT ................................................1

ISSUES PRESENTED FOR REVIEW ................................................1

STATEMENT OF THE CASE.............................................................4

    I.    Statement of Facts ...............................................................4

    II.   Procedural History.............................................................11

SUMMARY OF THE ARGUMENT ..................................................13

STANDARD OF REVIEW ...............................................................16

ARGUMENT ....................................................................................17

    I.    The district court erred in denying Plaintiffs' motion for
        summary judgment as to Count II, and granting Defendants'
        motion as to the same, as the social networking policy is
        unconstitutional. ................................................................17

    II.   The district court erred in determining Richards's comments
        were not protected by the First Amendment. .....................20

    III.  The district court erred in determining Chief Dixon was entitled
        to qualified immunity for the establishment of the social
        networking policy................................................................24

    IV.  The district court erred in deciding Dixon was entitled to
        qualified immunity for disciplining Liverman....................27

    V.   The district court erred in deciding the City was not subject to
        municipal liability for the establishment of the 2013 Social
        Networking Policy..............................................................29

VI.    The district court erred in deciding the City was not subject to municipal liability for the discipline of the Plaintiffs. .........................32

VII.    The district court erred in dismissing Count V, Liverman's retaliation claim, as there were material questions of fact in dispute..............................................................................................33

VIII.    The district court erred in dismissing Count VI, Richard's retaliation claim, as there were material questions of fact in dispute..............................................................................................35

IX.    The district court erred in reducing attorney fees awarded on Liverman successful claim. ...............................................................36

CONCLUSION ..................................................................................................39

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................40

CERTIFICATE OF SERVICE ............................................................................41

## TABLE OF AUTHORITIES

*Bailey v. Kennedy*,
   349 F.3d 731 (4th Cir. 2003) ...................................................................25, 27

*Blanchard v. Bergeron*,
   489 U.S. 87 (1989)......................................................................................38

*Board of the County Comm'rs v. Brown*,
   520 U.S. 397 (1997)................................................................................30, 32

*Campbell v. Galloway*,
   483 F.3d 258 (4th Cir. 2007) ........................................................................28

*City of Riverside v. Rivera*,
   477 U.S. 561 (1986)......................................................................................38

*Connick v. Myers*,
   461 U.S. 138 (1983)............................................................. 19, 22-23, 28

*Desmond v. PNGI Charles Town Gaming, L.L.C.*,
   630 F.3d 351 (4th Cir. 2011) ........................................................................16

*Durham v. Jones*,
   737 F.3d 291 (4th Cir. 2013) ........................................................................29

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) ........................................................................21

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006)......................................................................................21

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
   218 F.3d 337 (4th Cir. 2000) ........................................................................28

*Harman v. City of New York*,
   140 F.3d 111 (2d Cir. 1998) .........................................................................19

*Henry v. Purnell*,
   652 F.3d 524 (4th Cir. 2011) ........................................................................16

*Hudson v. Pittsylvania County*,
    774 F.3d 231 (4th Cir. 2014) .......................................................... 16, 35-36

*Kirby v. City of Elizabeth City*,
    388 F. 3d 440 (4th Cir. 2004) ....................................................................21

*Lane v. Franks*,
    134 S. Ct. 2369 (2014)...............................................................................20

*Love-Lane v. Martin*,
    355 F.3d 766 (4th Cir. 2004) .....................................................................21

*Meyers v. Baltimore Cnty., Md.*,
    713 F.3d 723 (4th Cir. 2013) .....................................................................27

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968).....................................................................18, 20, 25

*Ridpath v. Board of Governors*,
    447 F.3d 292 (4th Cir. 2006) ................................................... 17, 24-25, 27

*Sanjour v. EPA*,
    56 F.3d 85 (D.C. Cir. 1995).......................................................................18

*Smith v. Gilchrist*,
    749 F.3d 302 (4th Cir. 2014) .....................................................................21

*Stickley v. Sutherly*,
    416 Fed. Appx. 268 (4th Cir. 2011) ...................................................... 31-32

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014)........................................................................25, 27

*United States v. Nat'l Treasury Emples. Union*,
    513 U.S. 454 (1995)...................................................................................18

28 U.S.C § 1331 .................................................................................................1

42 U.S.C. § 1291 ................................................................................................1

42 U.S.C. § 1294 ................................................................................................... 1

42 U.S.C. § 1983 ............................................................................................... 1, 38

42 U.S.C. § 1988 ....................................................................................... 4, 16, 36, 38

# JURISDICTIONAL STATEMENT

This case bring claims pursuant to 42 U.S.C. § 1983. The U.S. District Court for the Eastern District of Virginia, Richmond Division, had jurisdiction under 28 U.S.C § 1331. The district court issued a final order disposing of all parties' claims on May 6, 2015, following Plaintiffs' for summary judgment as to Counts I and II, and Defendants' motion for summary judgment on all counts. On May 26, 2015, the district court extended appeal deadlines until thirty days after an order addressing attorney fees. The court issued this order awarding attorney fees on September 9, 2015. Plaintiffs' joint notices of appeal were filed October 7 and 9, 2015. This Court has jurisdiction pursuant to 42 U.S.C. §§ 1291 and 1294(1).

# REQUEST FOR ORAL ARGUMENT

Richards and Liverman request the opportunity to state orally the reasons the requested relief should be granted.

# ISSUES PRESENTED FOR REVIEW

**I.    Did the district court err in denying Plaintiffs' motion for summary judgment as to Count II, and granting Defendants' motion as to the same?**

**Suggested Answer:** Yes. Count II is Richards's claim that he was subjected to an unconstitutional social networking policy. The district court declared the social networking policy to be unconstitutional, and it is, but granted the

1

Defendants judgment based on the content of Richards's Facebook comments, which is not properly at issue under the Count II.

## II. Did the district court err in determining Richards's comments were not protected by the First Amendment?

**Suggested Answer:** Yes. The district court dismissed Counts II and IV, Richards's separate claims related to the social networking policy and his discipline under that policy, finding his comments were not related to a matter of public concern. Richards's comments were on the same subject matter as Liverman's comments, which were about a matter of public concern.

## III. Did the district court err in determining Chief Dixon was entitled to qualified immunity for the establishment of the social networking policy?

**Suggested Answer:** Yes. The policy is unconstitutional under clearly established law, and a reasonable officer in Dixon's position would have known this. The district court erred by considering the content of Liverman's Facebook posts rather than the establishment of the policy.

## IV. Did the district court err in deciding Dixon was entitled to qualified immunity for disciplining Liverman?

**Suggested Answer:** Yes. The district court found Dixon may have believed Liverman's comments were personal grievances, when the content of the statement and the circumstances of the case provide little to no support for such a conclusion. At best, there are facts in dispute.

**V.    Did the district court err in deciding the City was not subject to municipal liability for the establishment of the social networking policy.**

**Suggested Answer:** Yes. The district court found Dixon was not a final decision maker, but a city ordinance authorizes him to command and supervise the police force. The general orders issuing the social networking policy exercised this authority.

**VI.    Did the district court err in deciding the City was not subject to municipal liability for disciplining the Plaintiffs?**

**Suggested Answer:** Yes. The district court found Dixon was not a final decision maker, but a city ordinance authorizes him to command and supervise the police force. The discipline exercised this authority, and the City ratified the discipline.

**VII.    Did the district court err in dismissing Count V, Liverman's retaliation claim?**

**Suggested Answer:** Yes. There are material questions of fact as to whether pretext was employed to retaliate against Liverman after he notified the City of his claims.

**VIII.    Did the district court err in dismissing Count VI, Richard's retaliation claim?**

**Suggested Answer:** Yes. The district court erroneously concluded there was no evidence any supervisor of Richards participated in the internal investigations

following his notice to the City of his claims, contrary to the procedures governing the internal investigations, Dixon's own affidavit, and other evidence.

### IX. Did the district court abuse its discretion in reducing attorney fees awarded to Liverman on Count I?

**Suggested Answer:** Yes. The duplicative and unreasonable reductions of fees abused the district court's discretion under 42 U.S.C. § 1988 and was contrary to the purpose of that statute.

## STATEMENT OF THE CASE

### I. Statement of Facts

Herbert E. Liverman and Vance R. Richards were police officers with the City of Petersburg ("City") Bureau of Police ("Department" or "Police Department"). Liverman was with the Department since January 1995. He has served as an instructor at the regional police academy and the coordinator of Applied Patrol Tactics. He also revised the Applied Patrol Tactics training techniques. JA at 16, 50, 65, 107. Richards joined the Department in December 2010, after more than 19 years with other law enforcement agencies in the Commonwealth. He has experience as a crisis intervention officer and has taught at the regional police academy. JA at 17, 50-51, 65-66, 110.

John I Dixon, III is the Chief of Police for the City. JA at 11-12, 48-49, 63-64. The General Orders give the Chief of Police broad authority over internal affairs investigations and disciplinary proceedings. JA at 826-40. The Chief

assigns the investigation "as necessary," and those assigned to it report directly to the Chief. JA at 829, 831. The Chief can control the length of the investigation, and the Chief makes the final determination as to whether a violation occurred. JA at 836-37. His own affidavit admits that he "order[s] that certain matters be investigated and I determine discipline." JA at 906.

Additionally, City Code § 70-36 makes it the "duty of the chief of police to command and supervise the police force of the city under the general direction of the city manager." JA at 152. Under this authority, in December 2010 Chief Dixon promulgated a social networking policy as a general order governing the Department. JA at 154-58. In April 2013, Dixon issued a slightly revised social networking policy as a general order. JA at 159-63. The policy governs officers' use of social networking websites, including Facebook, both on-duty and off-duty. JA at 154, 159.

The policy "prohibit[s] activities . . . that may discredit" the Police Department or any other City department. JA at 154, 159. Department employees are directed not to "disseminate information . . . to the internet or any other forum (public or private) that would tend to discredit or reflect unfavorably" on the Police Department or any other City department. JA at 156, 161. The policy states:

> Negative comments on the internal operations of the [Department], or
> specific conduct of supervisors or peers that impacts the public's
> perception of the [D]epartment is not protected by the First

Amendment free speech clause, in accordance with established case law.

JA at 157, 162. ("Negative Comments Provision.") The policy states:

> Officers may comment on issues of general or public concern (as opposed to personal grievances) so long as the comments do not disrupt the workplace, interfere with important working relationships or efficient work flow, or undermine police confidence in the officer. The instances must be judged on a case-by-case basis.

JA at 157, 162. ("Public Concern Provision.") The Policies conclude:

> The [Department] strongly discourages employees from posting information regarding off duty activities. Additional, [sic] social networking violations deemed to be in violation of the [Department's] Rules of Conduct R&R 1-2 will be forwarded to Chief of Police [sic] or Designee for appropriate disciplinary action.

JA at 158, 163.

While off-duty on June 17, 2013, Liverman saw posts on the Facebook page of a regional police academy instructor referencing recent academy graduates becoming instructors. JA at 107. Liverman posted the following on his own Facebook page:

> Sitting here reading posts referencing rookie cops becoming instructors. Give me a freaking break. over [sic] 15 years of data collected by the FBI in reference to assaults on officers and officer deaths shows that on average it takes at least 5 years for an officer to acquire the necessary skill set to know the job and perhaps even longer to acquire the knowledge to teach other officers. But in todays [sic] world of instant gratification and political correctness we have rookies in specialty units, working as field training officer's [sic] and even as instructors. Becoming a master of your trade is essential, not [sic] only does your life depend on it but more importantly the lives of others. Leadership is first learning, knowing and then doing.

JA at 398. Liverman's reference to "15 years of data collected by the FBI" relates

to FBI's *Violent Encounters: A Study of Felonious Assaults on Our Nation's Law*

*Enforcement Officers*, page 159, which states:

> The amount of street time needed in an agency to lose the rookie
> status varies from agency to agency. Many officers expressed that this
> generally occurs after spending 5 years on patrol and becoming
> comfortable with their positions in the law enforcement profession.

JA at 108, 422.

Many people "liked" this post or commented on Liverman's post. JA at 398-

406. Richards, while off duty, commented:

> Well said bro, I agree 110%... Not to mention you are seeing more
> and more younger Officers[sic]  being promoted in a [sic] Supervisor/
> or [sic] roll [sic]. It's disgusting and makes me sick to my stomach
> DAILY. LEO Supervisors should be promoted by experience… And
> what comes with experience are "experiences" that "they" can pass
> around to Rookies and younger less experienced Officers. Perfect
> example, and you know who I'm talking about….. How can
> ANYONE look up, or give respect to a SGT in Patrol with ONLY 1
> 1/2yrs [sic] experience in the street? Or less as a matter of fact. It's a
> Law Suit [sic] waiting to happen. And you know who will be
> responsible for that Law Suit? A Police Vet, who knew tried [sic]
> telling and warn [sic] the admin for promoting the young Rookie who
> was too inexperienced for that roll [sic] to begin with. Im [sic] with ya
> bro….smh.

JA at 110-11, 399 (ellipses in original). Liverman later commented while

off-duty:

> There used to be a time when you had to earn a promotion or a spot in
> a specialty unit…but now it seems as though anything goes and
> beyond officer safety and questions of liability, these positions have

7

been "devalued"…and when something has no value, well it is worthless.

JA at 107, 399 (ellipses in original). Richards commented again while off-duty:

> Your right [sic]….. The next 4yrs can't get here fast enough… From what I've been seeing I don't think I can last though. You know the old "but true" saying is…. Your Agency is only as good as it's [sic] Leader(s)… It's hard to "lead by example" when there isn't one….smh

JA at 110-11, 400 (ellipses in original).

The Department became aware of the above Facebook exchange. Two lieutenants and a captain met jointly with First Sergeant Waldron (Richards's supervisor) and First Sergeant Chambliss (Liverman's supervisor). JA at 848. Chambliss recalls he and Waldron were directed to discipline Liverman and Richards for violating the social networking policy for the Facebook exchange. JA at 848. Chambliss and Waldron expressed concerns the discipline would violate Liverman's and Richards's freedom of speech. JA at 849-850. Chambliss did not believe the meeting provided clear-cut direction on how to proceed, and so he and Waldron raised their concerns directly with Chief Dixon. Chief Dixon said the statements were a clear violation of the policy and the sergeants were to proceed with the discipline. JA at 850-851. Chambliss took this as an order. JA at 853.

Chambliss and Waldon prepared disciplinary report forms. JA at 427-428, 851-854. They cited the Negative Comments Provision because "[l]ooking at what

was stated, the only thing that closely came into play was Number 4, Negative
Comments." JA at 854. In addition to an oral reprimand, Chambliss and Waldron
were ordered to place Liverman and Richards on a six-month probationary period.
JA at 427-428, 851-852. Dixon claims responsibility for this decision, but the city
manager ratified the return to probation. JA at 503, 523-24. The authority, if any,
for this probationary period remains in dispute. JA at 83-84, 481-82, 695.
Liverman and Richards were advised the oral reprimand and return to probation
were not grievable and would not affect their ability to be promoted. JA at 724,
739.

Weeks later, the Department announced an opportunity for officers to seek
promotion to the rank of sergeant. JA at 431. The next day, Dixon promulgated a
general order that altered the qualifications for promotion. JA at 196-203. While
Liverman and Richards were otherwise qualified to apply for the promotion, and
were qualified under the prior policy, the new policy excluded officers on
probation. JA at 85, 109, 111, 119-22, 197, 204-12. When Liverman and Richards
did apply, they were both denied the opportunity to test for promotion based on
their probationary status. JA at 433-438.

Liverman and Richards retained counsel and sent a letter dated October 1,
2013, advising the City they believed their rights had been violated by their
discipline and by being denied the opportunity to seek promotion. JA at 797-805.

This letter sought certain documents. JA at 803-804. While collecting the requested documents, the Department's chief of staff allegedly discovered Liverman had previously had a consensual sexual relationship with a female coworker. JA at 509. Liverman was subjected to a broad internal affairs investigation. JA at 807. Within a day of this investigation beginning, Richards was also subjected to an internal affairs investigation for allegedly disclosing confidential information to the media. JA at 806, 808-09. (The alleged confidential information was simply that a Department officer was married to a man arrested after a shoot-out with the police. JA at 489.) The investigation into Richards's conduct ended about a week later when he was able to demonstrate his innocence. JA at 744, 812.

During the investigation into Liverman's conduct, Liverman admitted violations of various rules. He asked to be disciplined consistent with the discipline administered to other officers for similar conduct. JA at 729-30. (His female colleague received a brief suspension and return to probation. JA at 777. Similar conduct in the Department had previously resulted in a temporary demotion or a counseling. JA at 778.) A short time later, Dixon personally and summarily ordered Sergeant Chambliss to discipline Liverman in connection with an unrelated event. JA at 874. This discipline concerned an order of the Chief that was relayed from the Chief to Chambliss, from Chambliss to dispatch, and from dispatch to the fellow officer, and from the officer to Liverman. JA at 731-735,

10

872-81. The Chief ordered Liverman disciplined when he learned Liverman had not complied with the order given, before determining what instructions Liverman had in fact received. JA at 874. Dixon ultimately decided to terminate Liverman. JA at 817. A letter was sent to Liverman terminating him, but the Department accepted Liverman's resignation in December 2013 before Liverman received notice of his termination. JA at 737, 792, 823.

Approximately two months after Liverman's employment with the Department ended, Richards was subjected to another internal affairs investigation. JA at 824. This investigation ended with a finding that Richards had violated an executive order promulgated by Dixon in September 2013 for conduct unrelated to the initial investigation. JA at 746, 825.

## II.    Procedural History

Liverman and Richards filed suit on March 5, 2014. JA at 2. In Counts I and II, Liverman and Richards respectively claimed the social networking policy was unconstitutional under the First Amendment. JA at 38-40.  In Counts III and IV, Liverman and Richards respectively claimed the discipline and subsequent adverse employment actions were in response to the Facebook posts and unconstitutional under the First Amendment. JA at 40-43. In Counts V and VI, Liverman and Richards respectively claimed the internal affairs investigations were

unconstitutional retaliation for the notice of their claims in October, in violation of the First Amendment. JA at 44-46.

Liverman and Richards sought summary judgment as to Counts I and II, asking for equitable relief and a jury determination of damages. JA at 78-79. The Defendants sought summary judgment on all counts. JA at 472.

On April 8, 2015, the district court entered an order indicating it would grant summary judgment to Liverman as to Count I, declare the 2013 Social Networking Policy to be unconstitutional, and grant summary judgment to Defendants on all remaining counts. JA at 921-22. The court subsequently entered an Order dated May 5, 2015 stating its prior order was not intended as a final order, and judgment would be stayed until the court issued a memorandum opinion. JA at 923.

The district court issued its memorandum opinion and entered a final order on May 6, 2015. JA at 924-62. It entered judgment for Liverman as to Count I and judgment for the Defendants on the remaining counts. On May 26, 2015, the district court granted Plaintiffs' motion to extend appeal deadlines until thirty days after an order addressing attorney fees. JA at 1071-72. On September 1, 2015, the district court entered an order and issued a memorandum opinion denying Plaintiffs' motion to alter and amend the judgment. JA at 1105-21. On September 9, 2015, the district court awarded Liverman attorney fees of $14,156.00. JA at 1122-30.

12

The Plaintiffs filed joint notices of an appeal on October 7, 2015 and October 9, 2015, seeking a review of the district courts' orders dated April 8, May 6, September 1, and September 9. JA at 1132-35. This appeal follows.

## SUMMARY OF THE ARGUMENT

This appeal presents eight issues affecting the district court's summary judgment ruling and one issue regarding the court's calculation of Liverman's fee award for Count I.

The first issue concerns the summary judgment entered for the Defendants on Richards's claim that he was subjected to an unconstitutional social networking policy (Count II), and the denial of Plaintiffs' motion for summary judgment on this matter. The district court declared the 2013 social networking policy to be unconstitutional, and it is. JA at 922, 959, 1129. The court dismissed Richards's claim, however, asserting his Facebook comments were not protected by the First Amendment. JA at 939-41. This is irrelevant to Count II, which concerns the policy alone. Richards was subjected to an unconstitutional social networking policy and should have been awarded summary judgment like Liverman.

The second issue addresses the district court's conclusion that Richards's comments on Facebook were personal grievances not protected by the First Amendment. JA at 939-41. The court reached the opposite conclusion as to Liverman's comments, which were on the same subject matter. JA at 937-39.

13

Properly viewed on the summary judgment standard, Richards's statements were not purely personal grievances but were instead matters of public concern.

The third issue concerns the finding that qualified immunity attaches to Dixon's promulgation of the social networking policy. JA at 952-54. The policy is unconstitutional under clearly established law, particularly the Public Concern Provision and the Negative Comments Provision. A reasonable person in Dixon's position would have known the policies were unconstitutional.

The fourth question related to the grant of qualified immunity to Dixon for disciplining Liverman for his Facebook posts. JA at 952-54. While the court found Dixon could have believed Liverman's posts were personal grievances, JA at 953, the evidence does not support this conclusion on the summary judgment standard. The content of the statement and the circumstances of the parties indicate Liverman was not raising an issue that directly impacted him.

The fifth question concerns municipal liability for the promulgation of the social networking policy. JA at 954-55. The district court ruled Dixon was not a final decisionmaker, overlooking an ordinance expressly delegating the command and supervision of the police force to him. JA at 152. The evidence indicates Dixon was an authorized decisionmaker, as required, or at least a dispute of fact remains.

The sixth matter concerns municipal liability for the Department's discipline of Liverman and Richards for the Facebook comments. JA at 954-55. Again, Dixon acted under his authority and duty, established by ordinance, to command and supervise the police force. JA at 152. The discipline, moreover, was ratified by the City Manager, who the district court identified as the Chief's supervisor. JA at 523-24.

The seventh assignment of error addresses the dismissal on summary judgment of Count V, Liverman's claim of retaliation following his notice of claims. The district court accepted the Defendants' version of events, overlooking significant evidence of pretext. JA at 957-58. There are material questions of fact in dispute.

The eighth matter relates to the dismissal on summary judgment of Count VI, Richards's retaliation claim for the actions following his notice of claims. JA at 957-58. The district court erroneously concluded there was no evidence Richards's superiors were involved in the investigation, when the Department policies and the affidavit of Dixon demonstrates otherwise. JA at 829, 831, 836-37, 906.

The final issue concerns the calculation of Liverman's attorney fee award. The Court accepted Liverman's reductions for time unrelated to the case and his proposed twenty-per-cent reduction, and then imposed a duplicative deduction of five-sixths of the adjusted fees, on the apparent theory that only one of six claims

were successful. JA at 1086, 1128-29. This reduction significantly altered the lodestar calculation and denied Liverman the reasonable fees he should have been awarded for his successful claim under 42 U.S.C. § 1988.

## STANDARD OF REVIEW

The first eight issues concern the district court's ruling on summary judgment. This Court reviews summary judgment decisions de novo using the familiar standard district courts are to apply. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law. *Id.* When cross-motions for summary judgment are before the Court, as in this case for Counts I and II, the Court examines each motion separately. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).

The final issue concerns the attorney fee award. This Court reviews awards of attorney's fees for abuse of discretion and will reverse such awards if the district court is clearly wrong or committed an error of law. *Hudson v. Pittsylvania County*, 774 F.3d 231, 236 (4th Cir. 2014).

16

<u>**ARGUMENT**</u>

**I.    The district court erred in denying Plaintiffs' motion for summary judgment as to Count II, and granting Defendants' motion as to the same, as the social networking policy is unconstitutional.**

The district court dismissed Count II, Richards's claim that the social networking policy was unconstitutional, despite granting judgment for Liverman on his parallel claim (Count I). JA at 961. The court decided the "facial, as applied, or overbreath challenges" require the same legal analysis and therefore looked at the specific content of Liverman's and Richards's respective statements. JA at 934-35. It concluded Richards's comments related to personal grievances about the conditions of employment and therefore were not protected by the First Amendment. JA at 939-41.  In contrast, the court concluded Liverman's statements related to a matter of public concern, the balancing of interests favored Liverman, and he was disciplined for his comment. JA at 937-39, 941-51. The court's order declared the 2013 social networking policy to be unconstitutional, which is not challenged here. JA at 922, 959, 1129

Contrary to the district court's opinion, First Amendment challenges to employment policies are *not* judged by the same standards as challenges to individual adverse employment action. A public employer may not threaten to discipline a public employee in an effort to chill the employee's rights under the First Amendment. *Ridpath v. Board of Governors*, 447 F.3d 292, 319 (4th Cir.

17

2006). A threat of disciplinary action is a "potent means of inhibiting speech."

*Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968).

> [T]he Government's burden is greater with respect to [bans that chill speech before it happens] than with respect to an isolated disciplinary action. The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government.

*United States v. Nat'l Treasury Emples. Union*, 513 U.S. 454, 468 (1995).

In judging a policy, as opposed to individual adverse employment actions, the Court must therefore determine if the policy wrongly prohibits *any* protected conduct. In *NTEU* for instance, the Supreme Court declared unconstitutional a federal law prohibiting federal employees from accepting compensation for published articles or speaking engagements. In analyzing whether the law impacted speech on matters of public concern, the Court looked generally at the types of communications impacted, illustrated by affidavits of public employees. *Id.* at 466. The law as a whole was invalidated. Similarly, in *Sanjour v. EPA*, 56 F.3d 85, 91 (D.C. Cir. 1995), the D.C. Circuit Court contemplated the breadth of communications impacted by the challenged policy, not just the particular comments at issue in the case. "The challenged regulations clearly prevent [the plaintiffs] *and other executive branch employees* from addressing current government policies, perhaps the paradigmatic 'matter[] of public concern.'" *Id.*

(emphasis added) (second alteration in original) (quoting *Connick v. Myers*, 461

U.S. 138 (1983)). Likewise, in *Harman v. City of New York*, 140 F.3d 111, 117-

118 (2d Cir. 1998), the Second Circuit Court of Appeals contemplated all speech

affected by the regulation at issue, not simply the speech of the plaintiff:

> The challenged policies here regulate employee speech concerning the
> policies and practices of two of New York City's largest social service
> agencies. These regulations clearly aim at speech that is of
> considerable importance to the public.

As these cases demonstrate, the Court must judge the *policy* with respect to Count

II, not the *particular speech* of Richards.

Richards was subjected to the same unconstitutional social networking

policy as Liverman. The Negative Comments Provision prohibits *any* "[n]egative

comments on the internal operations of the [Department], or specific conduct of

supervisors or peers that impacts the public's perception of the [D]epartment,"

asserting such comments are "not protected by the First Amendment free speech

clause, in accordance with established case law." JA at 157, 162. While the Public

Concern Provision would nominally permit "comment on issues of general or

public concern," it still prohibits *any* comments that "disrupt the workplace,

interfere with important working relationships or efficient work flow, or undermine

police confidence in the officer." JA at 157, 162. Moreover the conflict between

these provisions is not specifically addressed—i.e., those situations where negative

comments about the Department or the City are matters of public concern. An

officer enforcing this policy, such as Sergeant Chambliss, would reasonably conclude *negative comments about the Department or the City are never protected speech* and *there is no need to balance the interest of the parties where comments appear to disrupt the workplace, interfere with important working relationships or efficient work flow, or undermine police confidence in the officer, even on matters of public concern*.

To the contrary, the case law since *Pickering* clearly establishes negative comments about one's superiors may be protected speech, and the respective interests of the parties and the public must be balanced on a case-by-case basis when the employee speaks as a citizen on matters of public concern. *Pickering*, 391 U.S. at 568, 574; *Lane v. Franks*, 134 S. Ct. 2369 (2014).

Even if the Court were to conclude, as the district court did, that Richards's speech on a particular occasion was not a matter of public concern, it was still unconstitutional to subject him to the social networking policy, and summary judgment in his favor is appropriate as to Count II. Damages should be determined by the jury.

## II. The district court erred in determining Richards's comments were not protected by the First Amendment.

The district court dismissed both of Richards's claims related to his Facebook comments (Counts II and IV) on summary judgment, concluding his statements concerned personal grievances and were not protected communications

20

under the First Amendment. JA at 939-41. In this, the district court adopted a

particular interpretation of Richards's comments inappropriately on summary

judgment. Contrary to the appropriate standard for summary judgment, the court

concluded, "If the employee cannot carry this burden [of showing protected speech

under the First Amendment], then summary judgment for the employer is

appropriate." JA at 941.

While not all speech of public employees is protected under the First

Amendment, speech as a citizen on a matter of public concern is protected. *Smith*

*v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014); *Love-Lane v. Martin*, 355 F.3d 766,

776 (4th Cir. 2004). A person is not speaking as a citizen when making statements

pursuant to official duties, but this exclusion does not extend to all statements

about the employer or the employment. *Garcetti v. Ceballos*, 547 U.S. 410, 420,

429 (2006). Speech involves a matter of public concern when it involves an issue

of social, political, or other interest to a community, when viewed in context. *Kirby*

*v. City of Elizabeth City*, 388 F. 3d 440, 446 (4th Cir. 2004). The determination

rests on whether the public or community is likely to be truly concerned with or

interested in the particular expression, or whether it is more properly viewed as

essentially a private matter between employee and employer. *Edwards v. City of*

*Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999). This is determined by the content,

form, and context of the statement, as revealed by the whole record. *Connick*, 461

U.S. at 147-48.

The lower court characterized Richards's comments as focusing on

"personal dissatisfactions that are not matters of public concern." JA at 941. While

the court determined Liverman's comments about "rookies in specialty units,

working as field training officer's [sic] and even as instructors" *did* relate to

matters of public concern, it overlooks Richards's comments about "more and

more younger Officers being promoted" to supervisor roles. JA at 398-400, 937-

41. Richards opines that supervisors in the law enforcement community "should be

promoted by experience" because "what comes with experience are 'experiences'

that 'they' can pass around to Rookies and younger less experienced Officers." JA

at 399. In this comment, Richards is not claiming he should be promoted.

Richards's comments are as much about the training and expertise of law

enforcement officers as Liverman's comments.

One particular line in the district court's opinion highlights its failure to

judge the facts in the light most favorable to Richards as the non-moving party.

The court asserts Richards's speech "is replete with references to himself: 'you

know who I'm talking about' and 'And you know who will be responsible for that

Law Suit? A Police Vet, who knew [and] tried [sic] telling and warn[ing] the

admin' and 'I'm with ya bro . . . smh.'" JA at 940. The self-references in the first

and third statements ("you know who I'm talking about" and "I'm with ya bro . . . smh") are common colloquialisms with little bearing on the substance of Richards's comments, and the third statement—"I'm with ya bro"—is a means of ratifying the public concerns expressed in Liverman's statements. Richards's comments, therefore, are clearly related to a matter of public concern. More tellingly, there is nothing in the second statement ("And you know who will be responsible . . .") to suggest it is self-referential. The court interprets the statements unfavorably for Richards in dismissing his claim on summary judgment.

Liverman's and Richards's comments must be read in conjunction with one another, and if any part of it relates to a matter of public concern, the speech is protected. *Connick*, 461 U.S. at 147-48. Richards's comments differ only superficially from Liverman's comments in its emotive language and personal antidotes. This does not change the subject matter. Richards's oblique identification of a particular example known to him and possibly to the reader does not make this a personal grievance. Rather it indicates Richards has adequate knowledge and information on this topic to have an informed opinion, and it helps persuade the reader that this is a matter of public concern. After all, personal knowledge is the starting point of an informed opinion.

The district court further suggests "it could appear that [Richards] was representing the Department when he made the comments on Facebook" because

"his Facebook page indicated that he was an employee for the Department and he also had photos of himself in uniform." JA at 940-41. This again improperly reads the record in the Defendants' favor. The connection between photos or content on Richards's Facebook page and the comments on Liverman's Facebook page is tenuous at best. Moreover, the record shows Richards's Facebook page was shared jointly with his wife. JA at 399. This private Facebook page is hardly a channel the public would reasonably mistake for official Department communications.

Given the foregoing, it was error for the court to conclude on summary judgment that Richards's comments were not matters protected by the First Amendment.

**III.    The district court erred in determining Chief Dixon was entitled to qualified immunity for the establishment of the social networking policy.**

The district court denied Liverman damages from Dixon as to Counts I, finding Dixon was entitled to qualified immunity. It wrote, "This Court . . . cannot find that Chief Dixon unreasonably adopted the 2013 Social Networking Policy, which claimed to track First Amendment principles." JA at 953. This reasoning effectively immunizes Dixon for publishing an faulty policy merely because the policy itself asserts it is not unconstitutional.

Qualified immunity shields government officials unless a reasonable person in the official's position would have known the conduct violates clearly established

statutory or constitutional rights. *Ridpath*, 447 F.3d at 306. A right is clearly

established if the contours of the right are sufficiently clear so that a reasonable

officer would have understood, under the circumstances at hand, that his behavior

violated the right. *Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir. 2003). The

salient question is whether the state of the law at the time of an incident provided

fair warning the conduct was unconstitutional. *Tolan v. Cotton*, 134 S. Ct. 1861,

1866 (2014). The Supreme Court has noted "the importance of drawing inferences

in favor of the nonmovant" in qualified immunity cases even under the clearly-

established prong of the standard. *Id*. at 1867.

The establishment of the social networking policy violated clearly

established law in several respects. The assertion in the Negative Comments

Provision that such comments are not protected by the First Amendment is

unfounded. Even the leading case on public employee free speech rights, *Pickering

v. Board of Education*, 391 U.S. 563 (1968), specifically held, "[S]tatements by

public officials on matters of public concern must be accorded First Amendment

protection despite the fact that the statements are directed at their nominal

superiors."  Similarly, the Public Concern Provision permits comments on matters

of public concern only "so long as" the comments do not harm the Department.

*Pickering* and it progeny require instead a balancing of the respective interest

25

*precisely when such harms occur*. In an oft-quoted line, the Court specifically

rejected a bright-line test like the one promulgated by the Department.

> Because of the enormous variety of fact situations in which critical
> statements by teachers and other public employees may be thought by
> their superiors, against whom the statements are directed, to furnish
> grounds for dismissal, we do not deem it either appropriate or feasible
> to attempt to lay down a general standard against which all such
> statements may be judged.

*Id.* at 569. While the Public Concern Provision claims infractions are to be judged

on a case-by-case basis, it does not propose the case-by-case *balancing of interests*

mandated by *Pickering*. It instead proposes a "case-by-case" application of a

bright-line rule.

Dixon, of course, is to be judged by the objective standard of what a

reasonable person in his position would believe. Dixon was the chief of police for a

small city preparing a policy to govern employees' communications on and off

duty. The Negative Comments Provision shows Dixon was aware this Policy

would have First Amendment implications and had case law available to him. JA

157, 162. He believed he had sufficient resources to draw a *firm* conclusion—

ultimately the wrong conclusion—regarding the scope of First Amendment

protections and to promulgate that legal conclusion as part of the policy of the

Department. A reasonable person in his position would know each social

networking policy was *not consistent with the First Amendment*, contrary to the

26

representations in the policy, and therefore Dixon is not entitled to qualified immunity.

### IV. The district court erred in deciding Dixon was entitled to qualified immunity for disciplining Liverman.

The district court determined Dixon was entitled to qualified immunity for disciplining Liverman because "this Court cannot conclude that Chief Dixon unreasonably viewed Liverman's Comment as involving personal grievances only." JA at 953. Nothing in Liverman's comments, however, can reasonably be construed as a personal grievance on a summary judgment standard.

Qualified immunity shields government officials unless a reasonable person in the official's position would have known the conduct violates clearly established statutory or constitutional rights. *Ridpath*, 447 F.3d at 306. A right is clearly established if the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right. *Bailey*, 349 F.3d at 741. The salient question is whether the state of the law at the time of an incident provided fair warning the conduct was unconstitutional. *Tolan*, 134 S. Ct. at 1866. The Supreme Court has noted "the importance of drawing inferences in favor of the nonmovant" in qualified immunity cases even under the clearly-established prong of the standard. *Id.* at 1867. The burden of proof and persuasion rests on the official asserting qualified immunity. *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013).

Liverman's comments are not simply personal grievances. *Connick v. Myers*, 461 U.S. at 149, demonstrates that if a single portion of the speech relates to a matter of public concern, the respective interests of the parties must be balanced to determine if discipline can be administered. *See also Campbell v. Galloway*, 483 F.3d 258, 267-268 (4th Cir. 2007). This is to be judged by the content, form, and context of a given statement. *Connick*, 461 U.S. at 147-48. The Fourth Circuit has held statements relating to public safety are quintessential matters of public concern. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 353 (4th Cir. 2000).

Liverman's initial statement concerned the qualifications of police instructors and officers in specialty units. It specifically connected the issue to public safety concerns. "Becoming a master of your trade is essential," he wrote. "[N]ot only does your life depend on it but more importantly the lives of others." JA at 398. His subsequent comment again concerned the qualifications of officers on specialty units and the diminished "value" of such units with inexperienced officers. This comment, too, makes explicit reference to "officer safety and questions of liability." JA at 398. There can be no question these comments related to matters of public concern and not simply to personal grievances.

The record is devoid of evidence that a person in the Chief's position would reasonably have believed Liverman had a personal grievance he was advancing.

There is no evidence Liverman was trying to beat rookies for an open position as an instructor or a position on a specialty unit, or that he was grousing over an opportunity awarded to a rookie instead of to him. There was no evidence he was complaining that a rookie had endangered him somehow. This is not like *Connick* where the employee was using a survey to collect ammunition for an ongoing confrontation with supervisors. There is no indication this criticism even concerned the Department specifically. Characterizing Liverman's comments as a personal grievance would mean any employee criticizing policy decisions of others in his field could be construed as a personal grievance. *See also Durham v. Jones*, 737 F.3d 291, 299-301 (4th Cir. 2013).

Without evidence to say Liverman's comments were reasonably perceived as purely personal grievances, it was error to grant Dixon qualified immunity on summary judgment on this matter.

**V.     The district court erred in deciding the City was not subject to municipal liability for the establishment of the 2013 Social Networking Policy.**

The district court denied Plaintiffs damages from the City with respect to Counts I to IV, asserting the "Plaintiffs fail to show that Chief Dixon possesses the final authority required to establish municipal liability." JA at 954. The Court considered local ordinances indicating the Chief of Police serves and the pleasure of the city manager and is "under the direction and control" of the city manager. In

light of these ordinances and its conclusion the City "never ratified the 2013 Social

Networking Policy," the court ruled no municipal liability attaches. JA at 954-55.

The district court errs in this analysis with respect to Counts I and II, related

to the establishment of the Social Networking Policies. As the Supreme Court has

stated:

> [P]roof that a municipality's legislative body *or authorized decisionmaker* has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality *or its authorized decisionmaker* itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (emphasis

added).

The issue, therefore, is not whether Dixon was subject to supervision by the

city manager or whether the Social Networking Policies were specifically

approved by the municipality. Rather the Court must determine if Dixon was an

"authorized decisionmaker" with respect to the establishment of the social

networking policy. These policies were issued as general orders. City Code § 70-

36 specifically provides it is the "duty of the chief of police to command and

supervise the police force of the city under the general direction of the city

manager." JA at 152. By imposing this duty by law on the Chief, the City made

Dixon an "authorized decisionmaker" with respect to the "command and

supervis[ion]" of the police force. In other words, he was the decisionmaker with the authority to issue General Orders binding the City employees within the Department, such as the Social Networking Policies. Dixon followed the standard practice in ratifying this policy without the City's review.  JA at 510. The establishment of the Social Networking Policies "intentionally deprived [the] [P]laintiff[s] of a federally protected right" and constitutes "action taken or directed by the . . . authorized decisionmaker [that] itself violates federal law." Municipal liability therefor attaches, by virtue of the ordinance authorizing the chief to command and supervise the Department.

This situation differs from *Stickley v. Sutherly*, 416 Fed. Appx. 268 (4th Cir. 2011), where an individual was terminated after going outside the ordinary grievance process to complain about a demotion. That case related to a single personnel decision made by the chief after a board of inquiry found the employee violated legitimate policies, and the employee acknowledged the violation of the policies in oral arguments. It did not relate to the establishment of an unconstitutional policy prospectively regulating employees' behavior, established by the chief of police under a local ordinance authorizing him to "command and supervise the police force." This case involves a decision by an authorized decisionmaker for the municipality depriving the plaintiffs of constitutional rights.

31

**VI.    The district court erred in deciding the City was not subject to municipal liability for the discipline of the Plaintiffs.**

As noted above, the district court ruled the City was not subject to municipal liability with respect to Counts I to IV, asserting Dixon was "under the direction and control" of the city manager and the City "never ratified the 2013 Social Networking Policy." Under *Brown*, 520 U.S. at 405, however,

> the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will . . . determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

With respect to Counts III and IV, City Code § 70-36 provides that it is the "duty of the chief of police to command and supervise the police force of the city under the general direction of the city manager." Chief Dixon acted to discipline Liverman and Richards for violating a general order he issued pursuant to this authority granted under the City Code. On this issue of disciplining members of the police force for violating a general order, Dixon was an "authorized decisionmaker" pursuant to City Code § 70-36. JA at 152. His actions in this respect violated federal law. The city manager, moreover, ratified this discipline, signing off on the adverse employment action. JA at 523-24. Therefore, municipal liability attaches.

As above, this situation differs from *Stickley*, 416 Fed. Appx. 268, where an individual was terminated after going outside the ordinary grievance process to

complain about a demotion. That case related to a single personnel decision made by the chief after a board of inquiry found the employee violated legitimate policies, and the employee acknowledged the violation of the policies in oral arguments. It did not relate to the enforcement of an unconstitutional policy established by the chief of police under a local ordinance authorizing him to "command and supervise the police force."

**VII. The district court erred in dismissing Count V, Liverman's retaliation claim, as there were material questions of fact in dispute.**

Counts V and VI of the Complaint concerned the Defendants' use of internal investigations and disciplinary measures against the Plaintiffs after their notice to the city of their First Amendment claims. As to Liverman's claim (Count V), the district court accepted the Defendants' version of events, without addressing Liverman's evidence of pretext. That evidence of pretext, broadly summarized, includes:

- *Causal link between the notice of claims and the investigations*. The so-called FOIA request that led to an internal investigation of Liverman was nothing other than the notice to the City of his claims. JA at 509. This letter provides motive to the defendants to find a means, even through the use of pretext, of discrediting and damaging Liverman. JA at 797-805.

- *Dixon's personal involvement in the investigations and discipline*. The General Orders give the Chief of Police broad authority over internal affairs

33

investigations and disciplinary proceedings. JA at 826-40, 906. Beyond this, Dixon personally and summarily ordered Liverman to be disciplined in connection with the purported failure to obey an order. JA at 874.

- *Unlikely temporal proximity*. The timing of the investigations against Liverman and Richards suggests a single overall intent to use the investigations as pretext to retaliate against Liverman and Richards. Within a month of the notice of claims, Liverman and Richards were each the subject of separate internal affairs investigations opened within one day of each other. JA at 806-09. A second investigation against Liverman was opened before the first issue was resolved. Shortly after Liverman's employment terminated, another investigation was opened against Richards. JA at 823-25.

- *Breadth of the investigations*. The breadth of the investigations involving both Liverman and Richards suggests these investigations were more in the line of fishing expeditions to discredit and harass them, rather than investigations properly tailored to address specific wrongdoing. JA at 746, 806-09, 825.

- *Disparate treatment*. Liverman was terminated for his admitted wrongdoing, while his female colleague received a brief suspension and return to probation. JA at 777. Historically, similar conduct was disciplined by a temporary demotion or a counseling, not termination. JA at 778.

- *Violation of procedure*. The record shows that Dixon relied on disciplinary action more than three years old to justify Liverman's termination, contrary to established policy indicating such records are to be purged from the officer's file. JA at 189, 818-21.

- *Further evidence of intent*. The record provides further circumstantial evidence of intent to retaliate against Liverman for his threatened suit. JA at 726-729. This includes, for instance, the explicit restrictions imposed on the officers' speech through Dixon's executive order issued September 2013. JA at 391-92.

This evidence of pretext must be given credit on Defendants' motion for summary judgment, and the evidence creates a question of fact for the jury.

## VIII.  The district court erred in dismissing Count VI, Richard's retaliation claim, as there were material questions of fact in dispute.

The district court dismissed Richards's retaliation claim (Count VI), asserting "[i]t is difficult to imagine how the Department could have determined to retaliation [sic] against Richards for filing suit against the City and Chief Dixon where the investigations were launched as a result of complaints made by fellow officers." JA at 959.This conclusion overlooks the role of Dixon in internal affairs investigation. Complaints are to be directed to the Chief. JA at 831.The Chief assigns the investigation "as necessary," and those assigned to it report directly to the Chief. JA at 829, 831.The Chief can control the length of the investigation, and the Chief makes the final determination as to whether a violation occurred. JA at

836-37. His own affidavit admits that he "order[s] that certain matters be investigated and I determine discipline." JA at 906. The district court therefore erred in asserting there was "no evidence" that the investigations were encouraged by anyone above Richards. JA at 959.

Additionally, the complaint against Richards related to disclosure of asserted "police confidences," namely that a Department officer was married to a man recently arrested after a shoot-out with the police. JA at 489. Richards did not disclose this, but doing so was not the disclosure of police confidences, making the investigation baseless on its face. This, in conjunction with the issue described above in reference to Count V, evidences pretext and makes the dismissal of Count VI inappropriate.

## IX.    The district court erred in reducing attorney fees awarded on Liverman successful claim.

The final issue concerns the district court's calculation of attorney fees. The court determined it was appropriate to award attorney fees to Liverman pursuant to 42 U.C.S § 1988, and this is not disputed here. JA at 1129. A district court awards these fees in three steps. First, it determines the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. Second, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Third, the court should award some percentage of the remaining amount,

depending on the degree of success enjoyed by the plaintiff. *Hudson*, 774 F.3d at 236.

In this case, the district court's memorandum opinion reviewed information submitted by the parties and their arguments. Liverman calculated a lodestar amount of $117,354. He acknowledged reductions $11,184 for unrelated, unsuccessful claims. He proposed a reduction, if any, not to exceed 20%, reducing the attorney fees to no less than $84,936. JA at 1127-28. His calculations were supported by expert opinion. JA at 991-1003. Defendants, without the aid of an expert, asked for the total amount of fees requested to be reduced to by five-sixth, to account for only one of six claims succeeding, and then by another two-thirds to reflect the limited success on the claim. JA at 1086. The district court found Liverman was entitled to an award of attorney fees and awarded him one-sixth of the lowest amount that he had requested, for a total of $14,156. JA at 1128-29

The court's calculations, therefore, appear to have accepted Liverman's lodestar amount of $117,354, Liverman's acknowledged reductions $11,184, Liverman's maximum proposed reduction of 20%, and then another reduction of five-sixths based on the argument that only one of six claims succeeded. JA at 1128-29. This reduced the fees awarded to a little over 12% of the total fees and 13.33% of the fees after Liverman's acknowledged reductions for unrelated work on unsuccessful claims.

The attorney fee award in actions under 42 U.S.C. § 1983 is intended to ensure competent counsel is available to civil rights plaintiffs. *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989). The Supreme Court has rejected the proposition that fee awards under § 1988 should be proportionate to the amount of damages a civil rights plaintiff actually recovers. *City of Riverside v. Rivera*, 477 U.S. 561 (1986).

Counsel for Liverman, not including support staff, spent more than 377 hours on this case, after reducing unrelated time. The attorney fee award is the equivalent of hourly attorney fees of $37.55, assuming the support staff remains unpaid. This is not sufficient to retain competent counsel. Alternatively, the district court's order is the equivalent of litigating the case with about 57 billable hours. This is not adequate time to investigate and litigate even a single-Count complaint under the Federal Rules of Civil Procedure seeking only the relief actually granted in this case. This award is therefore unreasonable given the purpose of § 1988.

The reduction of fees by five-sixths based apparently on the proportion of unsuccessful claims to successful claims is akin to the proportionality argument the Supreme Court rejected in *City of Riverside*. Moreover, this reduction was taken after the Court accepted the elimination of work for unrelated, unsuccessful claims and an additional maximum 20% reduction proposed by Liverman. In other words,

the Court unreasonably imposed three layers of reductions off the lodestar amount, contrary to the established method of calculating damages.

Given the foregoing, the Court should remand for a recalculation of the fee award for Liverman as to Count I.

## CONCLUSION

Liverman and Richards ask this Court to schedule oral arguments on this matter, reverse the district court's judgment in part, direct the district court to enter judgment for Richards as to Count I, set a jury trial on damages as to Counts I and II, reverse the district courts' judgment as to Counts III to VI, and to remand for further proceedings consistent with the Court's opinion, including a recalculation of attorney fees.

**For the Appellants:**

By: _/s/ Andrew T. Bodoh_
            Counsel

Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
**THOMAS H. ROBERTS & ASSOCIATES, P.C.**
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-21058
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,045 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.

By:  _/s/ Andrew T. Bodoh_
                    Counsel

Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
**THOMAS H. ROBERTS & ASSOCIATES, P.C.**
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-21058
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2015, I will electronically file the

foregoing with the Clerk of this Court using the CM/ECF system, which will then

send a notification of such filing to any filing user including:

> William F. Etherington (VSB # 14152)
> Leslie A. Winneberger (VSB # 45040)
> 701 East Franklin Street, Suite 1200
> Richmond, Virginia 23219
> (804) 788-1500
> (804) 788-0135 (facsimile)
> wetherington@bealelaw.com
> lwinneberger@bealelaw.com
> *Counsel for Defendants-Appellants*

By: _/s/ Andrew T. Bodoh_
Counsel

Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
**THOMAS H. ROBERTS & ASSOCIATES, P.C.**
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-21058
*Counsel for Plaintiffs*

41